RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0234P (6th Cir.)
File Name: 01a0234p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

DBM TECHNOLOGIES, INC.,
    *Plaintiff-Appellant,*

    *v.*

LOCAL 227, UNITED FOOD &
COMMERCIAL WORKERS
INTERNATIONAL UNION,
    *Defendant-Appellee.*

No. 00-5449

Appeal from the United States District Court
for the Western District of Kentucky at Owensboro.
No. 99-00203—Joseph H. McKinley, Jr., District Judge.

Argued: May 4, 2001

Decided and Filed: July 20, 2001

Before: SILER and GILMAN, Circuit Judges; DUGGAN,
District Judge.*

---

*The Honorable Patrick J. Duggan, United States District Judge for
the Eastern District of Michigan, sitting by designation.

-----------------

**COUNSEL**

-----------------

**ARGUED:** John Bickel, THACKER, BICKEL, HODSKINS & THACKER, Owensboro, Kentucky, for Appellant. Jonathan D. Karmel, KARMEL & GILDEN, Chicago, Illinois, for Appellee. **ON BRIEF:** John Bickel, THACKER, BICKEL, HODSKINS & THACKER, Owensboro, Kentucky, for Appellant. Jonathan D. Karmel, KARMEL & GILDEN, Chicago, Illinois, for Appellee.

-----------------

**OPINION**

-----------------

RONALD LEE GILMAN, Circuit Judge. An arbitrator determined that DBM Technologies, Inc. should reinstate a discharged employee with back pay. DBM filed suit against the employee's union, United Food & Commercial Workers, Local 227 (Union), claiming that the arbitration award should be vacated. The district court granted summary judgment for the Union. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

### I. BACKGROUND

**A.  Factual background**

Larry Jackson was a production employee who worked for DBM, a manufacturer of plastic parts for the automotive industry. Jackson was a member of the Union. The Union and DBM have a collective bargaining agreement that contains the following relevant provisions:

ARTICLE II - MANAGEMENT RIGHTS
Section 1 - The Company shall have the exclusive rights
. . . to discipline and discharge employees for just cause

484 U.S. at 43 (emphasis in original and internal quotation marks omitted). Based on this rule, the *Misco* court rejected an employer's argument that it was against public policy to reinstate an employee who brought drugs on the property of a company that operated heavy machinery. *Id*.

Unlike *Misco*, DBM has at least produced a modicum of statutory authority to support its public-policy claim. The statute and regulation cited, however, do not express an explicit, defined, and dominant public policy that a doctor's work release may be relied upon to the exclusion of all other considerations when deciding if an employee's refusal to perform a task was reasonable. These FMLA and ADA provisions apply only when qualified workers are requesting medical leave or when an employee who is disabled under the terms of the ADA requests a reasonable accommodation. Such statutory language has never been extrapolated to address the situation involved in the present case. We therefore reject DBM's public-policy argument.

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

. . . and to make such rules and regulations as it deems necessary for safe and efficient conduct of its plant and operations . . .

. . . .

ARTICLE   IV   -   GRIEVANCE   PROCEDURE ARBITRATION
Section 1 - Grievance Procedure
(a) A grievance is a complaint, dispute, or controversy in which it is claimed that the Company failed to comply with an express obligation assumed by it under the terms of this Agreement which involves either:

   1 -  A dispute as to the facts involved;
   2 -  A question concerning the meaning, interpretation, scope, or application of this Agreement; or
   3 -  Both

. . . .

Section 2 - Arbitration - (a) Should negotiations between the Company and the Union at the last step in the grievance procedure [detailed in Section 2(c)] fail to bring about an Agreement between the parties with respect to any grievance, either party may within thirty (30) days from the date of the final answer, submit the dispute to an Impartial Arbitrator . . .

. . . .

(d) The decision of the Impartial Arbitrator shall be final and binding upon both parties . . .
(e) The Impartial Arbitrator shall not have the power to make any award changing or amending or adding to the provisions of this Agreement.

. . . .

ARTICLE VI - SENIORITY

. . . .

Section 4 - Leaves of Absence

. . . .

(d) In the event of a sickness of any non-probationary employee, such employee shall be granted a leave of absence to cover the period of such illness . . . A doctor's

certificate will be required and the release of the doctor to return to work. Such leave may be required and the release of a doctor to return to work.

Jackson underwent triple-bypass open-heart surgery on June 21, 1998, and was on medical leave until September 28 of the same year. Upon returning to work, his cardiac physician released him to work "without restrictions." Jackson was initially assigned to "Repacking," where he was involved in preparing parts to be shipped out to DBM's customers. This was less physically demanding than the job he had previously performed.

Jackson's return to DBM was not a smooth one. During his first week back, he was twice chastised by Chester Pack, the plant manager, for not working fast enough. Pack also wanted to reassign Jackson to operate Press 13, one of the plant's machines that produces plastic parts. Jackson testified at the arbitration hearing that "I didn't mind working the press, any press because you know, I've worked it before, but right now at this time I felt that I couldn't do it." Several days later, Jackson was given a verbal warning by Pack about his job performance. Following this warning, Jackson complained to Pack's supervisor, Paul Fair, alleging that he was being treated unfairly by Pack. Jackson met with Pack, Fair, and Michael Baldwin, a chief steward with the Union, and was instructed to bring a note from his doctor to confirm any continuing medical limitations. Dissatisfied with this arrangement, Jackson called his union representative, and had a meeting scheduled for October 9, 1998 to have the matter addressed.

On October 9, Jackson arrived at work and discovered that he had been assigned to operate Press 13. He asked the Production Supervisor, Eddie Hempfling, about the assignment, and told Hempfling that "I don't feel I am able to operate the press." Jackson then went to Pack, again asserting his belief that he "wasn't able to operate the press at this time

But for all the reasons set forth in Part II.A. above concerning our standard of review, we may not vacate an arbitrator's findings of fact simply because we might have reached the opposite conclusion. The arbitrator's factual findings may be vacated only if there is no rational support for his award or if the findings are based on some form of dishonesty. *See Misco*, 484 U.S. at 39. Neither situation is present in the case before us. Accordingly, we reject DBM's challenge to the arbitrator's factual determinations.

### 3. The arbitrator's award is not contrary to public policy

DBM's final argument challenges the arbitration award as being contrary to public policy. Specifically, DBM argues that the Family and Medical Leave Act (FMLA) and the implementing regulations of the Americans with Disabilities Act (ADA) grant DBM the right to "rely upon objective medical opinion." *See* 29 U.S.C. § 2613(a) ("An employer may require that a request for leave under . . . this title be supported by a certification issued by the health care provider of the eligible employee"); 29 C.F.R. § 1630.14(c) ("A covered entity may require a medical examination (and/or inquiry) of an employee that is job-related and consistent with business necessity").

Although a court may vacate an arbitration award if it is contrary to public policy, such authority is exceedingly narrow. In *Misco*, the Supreme Court stated that

a court's refusal to enforce an arbitrator's *interpretation* of such contracts is limited to situations where the contract as interpreted would violate some explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests.

arbitrator did not find that DBM should have prophesied that this event would occur. Rather, the arbitrator cited the subsequent catheterization as corroborating the reasonableness of Jackson's health concerns at the time of discharge.

DBM's claim of error is essentially a challenge to the arbitrator's fact-finding. Simply stated, DBM is arguing that the arbitrator erroneously concluded that Jackson's refusal to operate Press 13 was based on reasonable health concerns. The Supreme Court in *Misco* was faced with a similar claim of error. *See Misco*, 484 U.S. at 39 ("The Company's position, simply put, is that the arbitrator committed grievous error in finding that the evidence was insufficient to prove [just cause for termination.]"). Nevertheless, the Court reaffirmed the narrow standard of review for such claims when it said: "No dishonesty is alleged; only improvident, even silly, fact-finding is claimed. This is hardly a sufficient basis for disregarding what the agent appointed by the parties determined to be the historical facts." *Id*. In the instant case, as in *Misco*, DBM has not alleged fraud or intentional misstatements by either Jackson, the Union, or the arbitrator. All DBM claims is that the arbitrator's fact-finding was seriously flawed.

DBM might actually have the better argument on the factual question at issue. It asserts that the arbitrator's award was erroneously based on insufficient evidence of Jackson's reasonable health concerns. Specifically, DBM points out that the only evidence available to it at the time of Jackson's discharge indicated that his health would not prevent him from performing the assigned tasks at Press 13. DBM challenges the arbitrator's reliance on an earlier stress test that DBM was unaware of until court proceedings commenced, as well as the catheterization that occurred three months after Jackson was terminated.

because of my condition." According to Jackson's testimony at the arbitration hearing, the following interaction transpired:

> He [Pack] said: Are you refusing to operate the press? And I said: No. . . . I'm not refusing . . . I don't feel that I'm able to operate the press at this time. Then he said: This is a serious offense, it's insubordination; refusing to run a press is suspension, and right now you're suspended.

Jackson was then instructed to return at 1:00 p.m. for a meeting. At this meeting, Jackson presented a doctor's note restricting him from lifting more than twenty pounds. Because the operation of Press 13 did not require the lifting of more than twenty pounds, the note was found inapplicable and Jackson was discharged.

At the arbitration hearing, Jackson produced other evidence to support the reasonableness of his belief that he was physically unable to operate Press 13 on October 9, 1998. This evidence included the fact that, at the time of his discharge, he was participating in a rehabilitation program. Jackson also submitted proof that, in January of 1999, he underwent another heart catheterization, which kept him out of work for two additional months.

On September 3, 1999, the arbitrator, agreeing with Jackson, determined that he should be reinstated with back pay. The arbitrator's decision declared that DBM was too hasty in its discharge of Jackson. Furthermore, the arbitrator concluded that DBM's reliance on the work release by Jackson's doctors without any further inquiry into the reasonableness of Jackson's refusal to operate Press 13 did not support a termination "for just cause."

## B.  Procedural background

On October 4, 1999, DBM filed suit against the Union pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and § 10 of the Arbitration Act, 9 U.S.C. § 10, claiming that the arbitrator's award "is without rational support and cannot be rationally derived from the terms of the collective bargaining agreement," and thus should be vacated. Both parties filed cross-motions for summary judgment. The district court denied DBM's motion on March 2, 2000, but granted summary judgment in favor of the Union.

## II.  ANALYSIS

## A.  Standard of review

We review de novo the district court's grant of summary judgment. *See*, *e.g.*, *Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000). Summary judgment is proper when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The judge is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine issue for trial exists only when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

Although our review of the district court's grant of summary judgment is de novo, the deference that federal courts must give to the settlement of a labor dispute by an arbitrator is substantial. In fact, this court has called our review over such arbitration awards "one of the narrowest standards of judicial review in all of American

a convincing argument explaining how the requirement of a doctor's release in order to return to work after a medical leave of absence clearly trumps the arbitrator's authority to conclude that DBM had an insufficient basis to discharge Jackson. Accordingly, we find no express conflict between the collective bargaining agreement and the arbitrator's determination that Jackson's refusal to operate Press 13 was reasonable, despite the existence of a doctor's release "without restrictions."

### 2.  The arbitrator's findings of fact should not be disturbed

We are next asked to determine whether the arbitrator's conclusion that there was no just cause to discharge Jackson was correct. In his decision and award, the arbitrator determined that DBM wrongly relied on the doctor's release "without giving any consideration to the fact that Grievant, having had triple bypass surgery within three (3) months of recuperation, would not have the energy, fitness, or attitude he had prior to the surgery." The arbitrator decided that Jackson's refusal to work was reasonable based on the bypass operation, the three months of recuperation, the ongoing rehabilitation at the time, and on events subsequent to the termination, including Jackson's appointment with a cardiologist and a cardiac catheterization. Because only *unreasonable* refusals to work justify discharge, the arbitrator determined that DBM lacked just cause under the collective bargaining agreement to terminate Jackson's employment.

DBM challenges this conclusion, particularly pointing out that it should not be charged with knowledge of subsequent events, such as the catheterization, when it was faced with Jackson's alleged insubordination. According to DBM, it had the right to rely on Jackson's medical condition at the time of the discharge in determining whether Jackson's refusal to work was reasonable. But DBM misunderstands the import of Jackson's subsequent catheterization procedure. The

was emphasized by this court in *Bruce Hardwood Floors v. S. Council of Indus. Workers*, 8 F.3d 1104 (6th Cir. 1993), where an employee was discharged for falling asleep while on duty. At issue on appeal was the proper interpretation of two competing provisions of the collective bargaining agreement. In one section, the agreement permitted discharge for "just cause," and required the company to consider aggravating and mitigating circumstances when deciding whether just cause for discharge existed. Another section of the agreement, however, listed several examples of conduct for which "an employee may be discharged immediately." *Id.* at 1105. The company argued that the latter section modified the former and created a list of actions that constituted "per se just cause." *Id.* at 1007. Disagreeing with the company, the arbitrator ruled that even for the listed offenses, Bruce Hardwood still had to consider mitigating and aggravating circumstances in determining whether just cause existed.

This court upheld the arbitrator's award, which had been vacated by the district court, and concluded that "[w]hether the arbitrator's reading of the agreement was strained or even seriously flawed, and whether the district court's *per se* just cause analysis is more plausible, is irrelevant . . . The arbitrator arguably construed and applied the agreement, and this is precisely what the parties bargained for him to do." *Id.* at 1108. Thus, even if an arbitrator's interpretation of an agreement might lead to a potential conflict with another provision, or represents a "strained or even seriously flawed" reading of the contract, the award must be upheld so long as the contractual language is not "sufficiently clear so as to deny the arbitrator the authority to interpret the agreement as he did." *Eberhard Foods, Inc. v. Handy*, 868 F.3d 890, 893 (6th Cir. 1989).

The potential conflict between the leave-of-absence section of DBM's collective bargaining agreement with the Union and the arbitrator's award is even more tenuous than that which existed in *Bruce Hardwood*. DBM has not presented

jurisprudence." *Lattimer-Stevens Co. v. United Steelworkers of Am., AFL-CIO, Dist. 27, Sub-Dist. 5*, 913 F.2d 1166, 1169 (6th Cir. 1990). The reason for this deference is the explicit statutory policy giving preference to the private settlement of labor disputes. *See* 29 U.S.C. § 173(d) ("Final adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement."); *see also United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 37 (1987) (stating that "[t]he reasons for insulating arbitral decisions from judicial review are grounded in the federal statutes regulating labor-management relations"). This policy "would be undermined if courts had the final say on the merits of the awards." *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 596 (1960). Thus, when a collective bargaining agreement provides for a private mechanism of arbitrating a dispute,

> it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept. Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts. To resolve disputes about the application of a collective-bargaining agreement, an arbitrator must find facts and a court may not reject those findings simply because it disagrees with them.

*Misco*, 484 U.S. 37-38.

Based on the deference given to an arbitrator's award, this court's rule is that "[i]f an arbitrator's award draws its essence from the collective bargaining agreement and is not merely the arbitrator's own brand of industrial justice, we must uphold the award." *Gen. Truck Drivers, Local No. 957 v. Dayton Newspapers, Inc.*, 190 F.3d 434 (6th Cir. 1999). This court, in *Cement Divs., Nat'l Gypsum Co. v. Union Steelworkers of America, AFL-CIO-CLC, Local 135*, 793

F.2d 759 (6th Cir. 1986), had previously declared that the four ways in which an arbitrator's award might fail to draw its essence from the agreement occur when:

(1) an award conflicts with express terms of the collective bargaining agreement, (2) an award imposes additional requirements that are not expressly provided in the agreement, (3) an award is without rational support or cannot be rationally derived from the terms of the agreement, and (4) an award is based on general considerations of fairness and equity instead of the precise terms of the agreement.

*Id*. at 766 (citations omitted); *see also Misco*, 484 U.S. at 38 ("[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision.").

Finally, if a party is only challenging the factual findings of an arbitrator, the standard of review is even more stringent. The Supreme Court has held that if "[n]o dishonesty is alleged, [and] only improvident, even silly, fact-finding is claimed," this is an insufficient basis to vacate an arbitrator's award. *Misco*, 484 U.S. at 39. Thus, so long as an arbitrator had the authority within the collective bargaining agreement to make findings of fact, we must adhere to this stringent review of an arbitrator's factual determinations.

**B.    The district court did not err when it upheld the arbitrator's award**

**1.    *The arbitrator had the authority to decide if Jackson's refusal to operate Press 13 was reasonable***

The arbitrator found that Jackson had reasonable concerns about operating Press 13, thereby excusing the latter's refusal to accept the work assignment. He determined that

employees who have just returned to work after undergoing open-heart surgery might understandably have "fears and apprehension about what they can or should do." In conclusion, the arbitrator ruled that DBM should "have put Grievant [Jackson] on extended leave and . . . consulted with his medical advisors as to his present cardiac condition, rather than relying on a 'no restriction' medical statement."

DBM argues on appeal that the arbitrator's award departs from the essence of the collective bargaining agreement. According to DBM, the arbitrator's decision expressly conflicts with the part of the agreement detailing the rules for a leave of absence. DBM points to Article VI, Section 4(d), of the collective bargaining agreement, which states that "[a] doctor's certificate will be required and the release of the doctor [presented in order] to return to work." It argues that "[i]nherent in this contractual authority is the company's right to rely on that doctor's statement." DBM contends that the arbitrator had no authority to decide if Jackson's refusal to operate Press 13 was reasonable because, according to the company, DBM had the right under the agreement to rely upon Jackson's medical release in deciding if it had just cause to discharge him.

This provision of the collective bargaining agreement, however, is not as broad as DBM claims. Although the provision gives DBM the right to rely on a doctor's statement when considering whether to allow an employee to return to work after medical leave, the express language does not give DBM the right to rely solely on a doctor's release for determining whether a refusal to work was reasonable. There must be a more explicit conflict between an arbitrator's award and the express language of a collective bargaining agreement for this court to vacate an award under the four-part test of *Gypsum*.

The requirement of an express conflict between the arbitrator's award and the collective bargaining agreement