CAPITOL BEVERAGE COMPANY, INC., d/b/a Dan Henry Distributing Company, Plaintiff/Counter–Defendant,

v.

TEAMSTERS LOCAL UNION NO. 580, Defendant/Counter–Plaintiff.

No. 5:01 CV 92.

United States District Court,
W.D. Michigan,
Southern Division.

July 8, 2002.

Shirlee M. Bobryk, White, Schneider, Baird, Young & Chiodini, PC, Okemos, MI, for Plaintiff/Counter–Defendant.

Kevin J. O'Neill, Rudell & O'Neill, PC, Dearborn, MI, for Defendant/Counter–Plaintiff.

## *OPINION*

CARMODY, United States Magistrate Judge.

This matter is before the Court pursuant to *Plaintiff's Motion for Summary Judgment* and *Defendant's Cross Motion for Summary Judgment.* (Dkt.# 16, 21). On November 2, 2001, the parties consented to proceed before me for all further proceedings, including trial and an order of final judgment. 28 U.S.C. § 636(c)(1). By

Order of Reference, the Honorable Richard Alan Enslen referred this case to me. (Dkt.# 15). As articulated herein, the Court finds that the arbitrator's decision in this matter is consistent with the relevant legal standards and must, therefore, be implemented. Accordingly, Plaintiff's motion is **denied** and Defendant's motion is **granted**.

## SUMMARY JUDGMENT STANDARD

In reviewing a motion for summary judgment, the Court must confine itself to the narrow questions of whether there exist "no genuine issue[s] as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). On a Rule 56 motion, the Court cannot try issues of fact, but is empowered to determine only whether there exist issues in dispute to be decided in a trial on the merits. *See Perez v. Aetna Life Insurance Co.*, 96 F.3d 813, 819 (6th Cir.1996); *Aiken v. The City of Memphis*, 37 F.3d 1155, 1161 (6th Cir.1994). The crux of the motion is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also, Terry Barr Sales Agency v. All–Lock Co., Inc.*, 96 F.3d 174, 178 (6th Cir.1996) (citing *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir.1989)).

A motion for summary judgment requires the Court to view "inferences to be drawn from the underlying facts...in the light most favorable to the party opposing the motion." *Matsushita Electric Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d

176 (1962)); *see also, Terry Barr Sales Agency*, 96 F.3d at 178; *Schaffer v. A.O. Smith Harvestore Products, Inc.*, 74 F.3d 722, 727 (6th Cir.1996). The opponent, however, has the burden to show that a "rational trier of fact [could] find for the non-moving party [or] that there is a 'genuine issue for trial.'" *Historic Preservation Guild of Bay View v. Burnley*, 896 F.2d 985, 993 (6th Cir.1989) (quoting *Matsushita Electric Ind. Co.*, 475 U.S. at 587, 106 S.Ct. 1348); *see also, Schaffer*, 74 F.3d at 727.

As the Sixth Circuit has recognized, recent Supreme Court decisions have encouraged the granting of summary judgments, as such may be "an appropriate avenue for the 'just, speedy and inexpensive determination' of a matter." *Kutrom v. City of Center Line*, 979 F.2d 1171, 1173 (6th Cir.1992). Consistent with this concern for judicial economy, "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505; *see also Bailey v. Floyd County Board of Education*, 106 F.3d 135, 140 (6th Cir.1997). Furthermore, mere allegations do not suffice. *See Cloverdale Equip. Co. v. Simon Aerials, Inc.*, 869 F.2d 934, 937 (6th Cir.1989) ("the party with the burden of proof at trial is obligated to provide concrete evidence supporting its claims and establishing the existence of a genuine issue of fact").

## BACKGROUND

This matter involves judicial review of an arbitrator's decision invalidating, in part, a disciplinary sanction imposed by Plaintiff on Donald Ouderkirk.

On November 16, 1976, Ouderkirk was hired as a driver/salesman by DeRose Distributors. According to Defendant, it had represented employees at DeRose since the 1960s. (Arbitrator's Ruling at 2). In

1990, Plaintiff purchased the distributorship, following which Defendant continued to represent Plaintiff's drivers, driver/salesmen, and warehousemen, including Ouderkirk.

On December 17, 1999, Ouderkirk was charged with drunk driving (OUIL), to which he subsequently pled guilty on January 27, 2000. Because of his conviction, Ouderkirk's commercial driver's license was suspended, preventing him from working as a driver and he was, therefore, reassigned to work in the warehouse. *Id.* According to Defendant, Kate Henry (an officer with Plaintiff and wife of the owner, Dan Henry), informed Ouderkirk that his reassignment to the warehouse would last for 100 days, after which he would be reassigned to position as a driver/salesman. Kate Henry denied this when she testified at the arbitration hearing. *Id.* at 3, 10–11.

Ourderkirk assumed his duties in the warehouse (at a lower rate of pay) and on June 15, 2000, he met with Dan Henry and requested reassignment to his previous position as a driver-salesman, asserting that his 100–day suspension was complete (the period of time between January 28th and June 15th is longer than 100 days because Ouderkirk missed work due to vacation and injury). *Id.* at 2–3. By this date, Ouderkirk's commercial driver's license (CDL) "had been cleared" and was "fully valid." *Id.* at 10.

Henry disputed Ouderkirk's contention that he was "merely suspended [from driving] for 100 days." *Id.* at 3. Henry informed Ourderkirk that "his old Driver–Salesperson job had been filled by another employee" and was, therefore, no longer available. *Id.* at 6–7. Henry further indicated to Ouderkirk that "an insurance agent had suggested that he would not be insurable." *Id.* at 7.

Ouderkirk filed a grievance the same day, asserting that he "was told that [he] would be suspended from driving for 100 days" and was "put in the warehouse so [he] could continue to work." He further asserted that "my 100 days are now up and I feel I have serve[d] my suspension." *Id.* at 3. Ouderkirk indicated that he wanted "to be return[ed] to the classification of Driver/Salesman and to be made whole for any lost wages." *Id.* at 4.

In response to the grievance, Plaintiff indicated that Ouderkirk was:

removed from his driving position due to being convicted for operati[ng] a vehicle under the influence. The Company neither suspended him nor suspended him with the intention that he would be returned to the driver position after 100 days. The Company removed him from that driver position. Based on Mr. Ouderkirk's driving record, he does not meet the Company's insurance company's minimum acceptability standards. Therefore, because he cannot be insured, he cannot be returned to a driver position. The grievance is denied on the merits.

*Id.* at 11. The matter was subsequently submitted to arbitration.

Defendant characterizes Ouderkirk's reassignment to the warehouse as a demotion. Plaintiff, on the other hand, asserts that its zero-tolerance policy prevents it from employing "Driver–Salespersons with OUIL convictions." At the arbitration hearing, a memo authored by Dan Henry was introduced which articulated the company's zero-tolerance policy. In part, the memo states that Plaintiff's insurance carrier:

is concerned about the driving record (both on and off the job) of every employee who drives one of our vehicles. They have the right to refuse to cover anyone who they feel is too great a risk.

If they won't cover you, we will have no choice but to dismiss you from your current position.

*Id.* at 7.[1]

Henry testified that "an OUIL conviction cannot be tolerated even if incurred while driving a personal vehicle." *Id.* at 7–8. Accordingly, Henry allegedly developed (prior to the incident involving Ouderkirk) a company policy that "an OUIL conviction would mean that Driver/Salespersons would lose their Routes 'forever.'" *Id.* at 9. As the arbitrator noted, however, "Henry's decision in this regard was not reduced to writing, was not noticed to CDL Drivers or negotiated into the Contract." *Id.*

Henry also testified that he "opted to retain Ouderkirk rather than terminate him in recognition of his length of service with the Company."[2] *Id.* at 8. Henry further testified that "he did not rely on the Contract in removing Mr. Ouderkirk from his Driver/Salesperson position but acted in accordance with Company Policy." *Id.* at 9. Henry further indicated that "it was the Company's intent to keep Mr. Ouderkirk in the Warehouse classification 'forever,' thereby permanently preventing him from seeking to successfully retain his old Route driving position." *Id.* at 5–6, 8–9.

The arbitrator concluded that Plaintiff could not "forever" assign Ouderkirk to the warehouse. *Id.* at 13–17. Specifically, the arbitrator determined that Ouderkirk's grievance, timely filed, challenged the length of his assignment to the warehouse, not the fact of such assignment. The arbitrator found that Ouderkirk's OUIL conviction constituted just cause to relieve him from his driving duties and transfer him to perform warehouse duties at a lower rate of pay.

The arbitrator further determined that Plaintiff's decision not to return Ouderkirk to his previous position as a Driver/Salesperson after spending 100 days working in the warehouse did not violate the collective bargaining agreement (the "Agreement"). With respect to Ouderkirk's claim that he was informed that he would only be assigned to the warehouse for 100 days, the arbitrator concluded that "there is wholly insufficient evidence that there was ever a '100 days' agreement with the Company."

The arbitrator concluded, however, that Plaintiff's "stated intention to forever disallow Grievant Ouderkirk the opportunity to reattain a Driver/Salesperson position during which he will be confined to Warehouse duties indefinitely as disciplinary action," violates the (a) just cause, and (b) seniority provisions of the Agreement. *Id.* Accordingly, the arbitrator ordered Plaintiff to permit Ouderkirk to "bid on the *first available* opening for a Driver/Salesperson position" in accordance with the Agreement's seniority provisions. *Id.* at 19.

## ANALYSIS

■ It has long been understood that courts play "only a limited role" when reviewing an arbitrator's decision, *United*

---

1. There is no evidence that Plaintiff's insurance carrier made the determination to not provide insurance coverage for Ouderkirk. Dan Henry testified at the arbitration hearing that "an insurance agent had suggested that [Ouderkirk] would not be insurable." (Arbitrator's Ruling at 6–7). At oral argument, Plaintiff reiterated that its insurance carrier had made no decision on the matter.

2. The Court notes that the "policy" does not seem to require termination for an off-duty OUIL conviction, in the absence of the insurance carrier's determination that the employee is no longer insurable.

*Paperworkers International Union, AFL–CIO v. Misco, Inc.,* 484 U.S. 29, 36, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987), and must, therefore, accord "substantial" deference to the arbitrator's resolution of labor disputes. *See DBM Technologies, Inc. v. Local 227, United Food & Commercial Workers International Union,* 257 F.3d 651, 656 (6th Cir.2001). Because the policy of resolving labor disputes by arbitration would be "undermined" by extensive judicial review, courts are "not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract." *Misco,* 484 U.S. at 36, 108 S.Ct. 364.

■■■ Even if the arbitrator's interpretation of the agreement "might lead to a potential conflict with another provision, or represents a 'strained or even seriously flawed' reading of the contract, the award must be upheld so long as the contractual language is not 'sufficiently clear so as to deny the arbitrator the authority to interpret the agreement as he did.'" *DBM Technologies,* 257 F.3d at 658 (quoting *Eberhard Foods, Inc. v. Handy,* 868 F.2d 890, 893 (6th Cir.1989)). Furthermore, the arbitrator's factual findings may be vacated "only if there is no rational support for his award or if the findings are based on some form of dishonesty," and "improvident, even silly fact-finding" will not suffice to challenge the arbitrator's factual findings. *Id.* at 659 (quoting *Misco,* 484 U.S. at 39, 108 S.Ct. 364).

Not surprisingly, judicial review of arbitration awards has been characterized as "one of the narrowest standards of judicial review in all of American jurisprudence." *Id.* at 656 (quoting *Lattimer–Stevens Co. v. United Steelworkers of America, AFL–CIO, Dist. 27, Sub–Dist. 5,* 913 F.2d 1166, 1169 (6th Cir.1990)).

■■ As the Supreme Court has stated, "[a]s long as the arbitrator's award 'draws its essence from the collective bargaining agreement,' and is not merely 'his own brand of industrial justice,' the award is legitimate." *Misco,* 484 U.S. at 36, 108 S.Ct. 364. In this respect, an arbitration award "fails to derive its essence from the agreement" when:

1. an award conflicts with express terms of the collective bargaining agreement;

2. an award imposes additional requirements that are not expressly provided in the agreement;

3. an award is without rational support or cannot be rationally derived from the terms of the agreement; and[3]

4. an award is based on general considerations of fairness and equity instead of the precise terms of the agreement.

*Cement Divisions, National Gypsum Co. v. United Steelworkers of America, AFL–CIO–CLC, Local 135,* 793 F.2d 759, 766 (6th Cir.1986).

Plaintiff asserts that the arbitrator's decision does not draw "its essence" from the

---

**3.** While the standard is articulated in this particular case (and others) using "and," these four items appear to be separate failures, only one of which need be present to nullify an arbitrator's ruling. *See Appalachian Regional Healthcare, Inc. v. United Steelworkers of America,* 245 F.3d 601, 604–05 (6th Cir.2001) (as a preface to listing these four factors, the court stated that it "has vacated arbitral awards in four types of cases," suggesting that each of the factors is, in itself, sufficient grounds to overrule an arbitrator's decision); *see also, Wyandot, Inc. v. Local 227, United Food and Commercial Workers Union,* 205 F.3d 922, 929 n. 3 (6th Cir.2000) (court expressly indicated that "only one" of the factors is necessary "to find that the arbitrator departed from the essence of the agreement").

Agreement and is, therefore, illegitimate and unenforceable. Specifically, Plaintiff claims that the arbitrator's decision conflicts with the express terms of the Agreement, imposes additional requirements not provided in the Agreement, and reflects the arbitrator's own notions of industrial justice.

## I. *The Arbitrator's Opinion does not Conflict with the Express Terms of the Agreement*

■ Plaintiff advances three arguments in support of its contention that the arbitrator's decision conflicts with the express terms of the Agreement: (1) the arbitrator did not base his decision upon the original written grievance, (2) the arbitrator disregarded the relevant grievance procedure deadlines, and (3) the arbitrator exceeded the authority expressly granted to him by the Agreement.

### A. The Arbitrator's Opinion is Based On the Original Written Grievance

Article VI, Section 2 of the Agreement provides that "[u]nless otherwise mutually agreed, the submission to the arbitrator shall be based only on the original written grievance submitted to the Employer in Step 2 of the Grievance Procedure."

As indicated above, in his grievance Ouderkirk asserted that he "was told that [he] would be suspended from driving for 100 days" and was "put in the warehouse so [he] could continue to work." He further asserted that "my 100 days are now up and I feel I have serve[d] my suspension." Ouderkirk indicated that he wanted "to be return[ed] to the classification of Driver/Salesman and to be made whole for any lost wages."

Plaintiff asserts that given the wording of the grievance, the arbitrator's authority was confined to the narrow question whether Plaintiff expressed to Ouderkirk

that he would be suspended from driving for only 100 days. Plaintiff claims that after resolving this issue in its favor, the arbitrator "ignored" the language of the Agreement and "independently expanded the scope of the grievance." In the Court's opinion, however, Plaintiff's interpretation of the grievance is unduly narrow and restrictive.

While the arbitrator concluded that there was insufficient evidence from which to conclude that there existed a "100 days" agreement between Ouderkirk and Plaintiff, the arbitrator further concluded that Ourderkirk "has not grieved his transfer to the Warehouse in the first instance...[but] is principally protesting the *length* of his assignment to the Warehouse." (Arbitrator's Ruling at 4–5).

The characterization by the arbitrator of the issue presented by Ouderkirk's grievance is reasonable and consistent with both the grievance and the totality of the circumstances. As the Sixth Circuit has stated:

> The extraordinary deference given to an arbitrator's ultimate decision on the merits applies equally to an arbitrator's threshold decision that the parties have indeed submitted a particular issue for arbitration: Considering the strong presumption in favor of a party's right to arbitration and the extent of an arbitrator's authority, it would be a strange and grudging interpretation of *Steelworkers Trilogy* to demand that arbitrators stay narrowly within the technical limits of the submission. We do not mean to imply that an award that clearly goes beyond the grievance submitted to the arbitrator is enforceable....But we do hold that the presumption of authority that attaches to an arbitrator's award applies with equal force to his decision that his award is within the submission.

*Cement Divisions,* 793 F.2d at 765 (quoting *Champion International Corp. v. United Paperworkers International Union,* 779 F.2d 328, 335 (6th Cir.1985)).

Accordingly, unless the arbitrator has "clearly exceeded the scope of the submission," the Court cannot overturn or modify his award on that ground. *Id.* As the arbitrator correctly observed, Ouderkirk was not challenging the fact of his transfer to the Warehouse, but rather the duration thereof. That Ouderkirk framed his grievance in the context of the alleged "100 days agreement" supports this conclusion. Moreover, the fact that the arbitrator found no evidence of any such agreement is of no consequence, as such does not detract from the nature of Ouderkirk's grievance. Finding that the arbitrator did not clearly exceed the scope of Ouderkirk's grievance, the Court concludes that the arbitrator's decision is based on the original written grievance as required by the Agreement.

**B. The Arbitrator did not Disregard the Grievance Procedure Deadlines**

■ Article VI, Section 2 of the Agreement provides that "no grievance will be considered or discussed unless it is presented to the Employer in writing no later than five (5) working days after the event which gave rise to it."

As the arbitrator observed, Ouderkirk's grievance "protests the Company's refusal on June 15, 2000, to reinstate him to the Driver/Salesperson classification after 100 days." (Arbitrator's Ruling at 4). As Ouderkirk submitted his grievance within five days of this denial, his grievance was timely.

Plaintiff asserts that because the arbitrator found no evidence of the alleged "100 days agreement," Ouderkirk's grievance was, therefore, untimely. This argument, however, confuses the merits of the grievance (or a portion thereof) with the issue presented by the grievance.

Plaintiff further asserts that "even assuming the Company suspended Ouderkirk for 100 days, the suspension expired on May 24, 2000." As Ouderkirk indicates in his grievance, while working in the warehouse he broke his elbow and was unable to work for a period of time, after which he was "put back in the warehouse." Moreover, as the arbitrator indicated, Ouderkirk also missed work following his conviction due to a previously scheduled vacation. *Id.* at 2.

It appears, therefore, that Ouderkirk interpreted the alleged 100 days agreement literally. Whether this interpretation is reasonable is irrelevant, as Ouderkirk was grieving the length of his transfer to the warehouse and he submitted his grievance within five days of the date on which he alleged that his transfer was to expire. Accordingly, the Court finds reasonable the arbitrator's determination that Ouderkirk's grievance was timely submitted.

**C. The Arbitrator did not Exceed the Authority Granted to him by the Agreement**

■ Article VI, Section 4 of the Agreement provides that "[t]he jurisdiction and authority of the impartial arbitrator shall be confined to the interpretation and application of the provisions of this Agreement. The arbitrator shall have no power or authority to add to, subtract from, alter or modify the provisions of this Agreement."

As noted above, the arbitrator, having interpreted Ouderkirk's grievance as challenging the length of his transfer to the Warehouse, received evidence on this particular issue. In this respect, Dan Henry testified that "it was the Company's intent to keep Mr. Ouderkirk in the Warehouse classification 'forever,' thereby permanent-

ly preventing him from seeking to successfully retain his old Route driving position." (Arbitrator's Ruling at 5–6, 8–9). As the arbitrator further observed:

> This constituted indispensable information to which Mr. Ouderkirk had not been privy when he filed his grievance on June 15, 2000. Because he has challenged the *length* of his transfer to the Warehouse—"100 days" and inherently *more* than 100 days, the undersigned Arbitrator becomes bound to address the Company's assertion that the discipline imposed upon Mr. Ouderkirk will be "forever."

*Id.* at 6.

The arbitrator concluded that "freezing" Ouderkirk into the warehouse classification violated the seniority and job-bidding provisions articulated in Article XIII of the Agreement. (Arbitrator's Ruling at 14–17). Article XIII, Section 3 of the Agreement provides:

> In the event of a job opening in any existing or new job in any of the above divisions, and covered by this Agreement, the job opening shall be filled in the following manner:
>
> 1. The employee with the greatest seniority within the division where the job opening occurs shall have the first priority to such job opening.
> 2. In the event that said job opening is not filled by an employee from within that division where the job opening occurs, then an employee from any other division shall have the right to fill such job opening in accordance with his seniority, provided he has the necessary capabilities to perform the open job.
> 3. The employer shall post for three (3) working days in a conspicuous place, any and all job openings in any division. If the job opening is not requested by an employee within said

three (3) days, then said job opening may be filled by the Employer as he sees fit. All new routes when posted shall include the territory and stops.

Plaintiff asserts that because "the issue of seniority and bidding rights was not included in [Ouderkirk's] grievance," the arbitrator violated Article VI, Section 4 of the Agreement by "decid[ing] a dispute not submitted in the grievance." Plaintiff's position represents, however, a misinterpretation of the grievance, the Agreement, and the arbitrator's authority.

As the arbitrator recognized, the Agreement affords Plaintiff the right "to maintain discipline and efficiency." (Arbitrator's Ruling at 11–12). The Agreement further provides, however, that employees "may be discharged or disciplined only for just cause." (Agreement, Article III, Section 1). Moreover, the Agreement expressly gives to the arbitrator the right to interpret the Agreement. (Agreement, Article VI, Section 4).

Inherent in the arbitrator's ruling is his interpretation that the Agreement permits him to review the nature and severity of the disciplinary sanction imposed upon Ouderkirk. In this respect, the arbitrator's interpretation of the Agreement rests on solid ground.

 As the Supreme Court has recognized, "[n]ormally, an arbitrator is authorized to disagree with the sanction imposed for employee misconduct." *Misco*, 484 U.S. at 41, 108 S.Ct. 364. Moreover, while the arbitrator's decision "must draw its essence from the agreement, he 'is to bring his informed judgment to bear in order to reach a fair solution of a problem...[and] *[t]his is especially true when it comes to formulating remedies.*'" *Id.* (citation omitted). While the parties may limit the discretion of the arbitrator in this

respect, failure to expressly do so requires the Court to "defer to the arbitrator's construction of the contract...as authorizing him to review employer sanctions." *Eberhard Foods*, 868 F.2d at 892.

The *Eberhard* case involved a circumstance in which two employees, Handy and Summa, were involved in an altercation. *Id.* at 890. The employer investigated the matter, determining that Summa "threw playing cards at Handy," after which Handy "twice hit Summa in the face." The employer subsequently determined that Handy, but not Summa, violated Rule 13 of the CBA which prohibited fighting on company time or property. *Id.* at 890–91. Rule 13 provided that any employee who violated it was "subject to discharge for the first offense." *Id.* Relying on this provision, the employer discharged Handy, whereas Summa was reinstated "without loss of time." *Id.* at 891.

The Union grieved Handy's discharge, and the matter ultimately proceeded to arbitration. After finding that Handy had violated Rule 13, the arbitrator further determined that "he had the authority under the CBA to review the penalty assessed Handy for such violation." In this respect, the arbitrator concluded that given "the difference in treatment" of Handy as compared with Summa, Handy's conduct, "while just cause for severe discipline," did not justify discharge.

The employer subsequently filed a complaint in United States District Court challenging the arbitrator's ruling. The district court overturned the arbitrator's ruling, finding that it violated the terms of the CBA and was based upon the arbitrator's notions of fairness and equity, rather than the "precise contract terms." *Id.* The Union argued that "the arbitrator had the power, not only to determine if a violation of the Rules occurred but also to determine the appropriate sanction notwithstanding that Rule 13 allows the employer to discharge an employee for fighting." *Id.* at 892. The district court concluded, however, that "once the arbitrator found that Handy violated Rule 13, the arbitrator was required to defer to the Rule 13 remedy of discharge." *Id.* at 891–92.

On appeal, the Sixth Circuit first noted that "it is the language of the CBA and the arbitrator's own construction thereof, which determines the scope of the arbitrator's authority." In this respect, the court observed that "nothing" in the CBA or work rules "expressly limits or removes from the arbitrator the authority to review the remedy in this case." Relying on *Misco*, the court indicated that "in such an instance, the courts must defer to the arbitrator's construction of the contract." Accordingly, the court concluded that in light of *Misco* and the language of the CBA, the arbitrator "did not act unreasonably or capriciously in construing the agreement to authorize review of the sanction imposed." *Id.*

The Sixth Circuit has since continued to articulate the proposition that in the absence of sufficiently clear language contradicting the arbitrator's interpretation of the agreement, courts must defer to an arbitrator's determination that the agreement affords him the authority to review employer-imposed disciplinary sanctions. *See, e.g., DBM Technologies,* 257 F.3d at 658 (an arbitrator's award "must be upheld so long as the contractual language is not 'sufficiently clear so as to deny the arbitrator the authority to interpret the agreement as he did' "); *Dixie Warehouse and Cartage Co. v. General Drivers, Warehousemen and Helpers, Local Union No. 89,* 898 F.2d 507, 511 (6th Cir.1990) ("the holdings of *Misco* and *Eberhard* permit the arbitrator to construe the contract to give him authority to review penalties in

the absence of a provision explicitly prohibiting such action").

Just as in *Eberhard,* there is "nothing" in the Agreement presently at issue which "expressly limits or removes from the arbitrator the authority to review the remedy in this case." The Court concludes, therefore, that the arbitrator's determination that the Agreement permitted him to evaluate the nature of the penalty imposed upon Ouderkirk was consistent with the Agreement.

## II. *The Arbitrator did not Impose upon Plaintiff Additional Requirements not Provided in the Agreement*

 Plaintiff claims that when the arbitrator addressed the issue of seniority, he cited to no particular article or section of the Agreement in support thereof. Plaintiff asserts, therefore, that the arbitrator's decision imposes upon it additional contractual obligations which the arbitrator "manufactured...out of whole cloth." As detailed above, the arbitrator's discussion of seniority rights is premised upon his reasonable conclusion that the Agreement permitted him to review the nature of the sanction imposed upon Ouderkirk.

In actuality, it is Plaintiff which seeks to impose upon Defendant additional terms and obligations not provided in the Agreement. As the arbitrator noted, "[i]n order for the Company to validly maintain that Grievant Ouderkirk's discipline will go on 'forever,' there must be a supporting provision in the Contract but there is none." (Arbitrator's Ruling at 15). Furthermore, as evidenced by its arguments in support of its motion for summary judgment, Plaintiff essentially seeks to insert into the Agreement language expressly preventing the arbitrator from reviewing employer imposed discipline, language which is presently not part of the Agreement.

Finally, the cases upon which Plaintiff relies for its claim that the arbitrator has imposed upon it additional obligations are readily distinguishable. Plaintiff first relies upon *International Assoc. of Machinists and Aerospace Workers, AFL–CIO, District 154 v. Lourdes Hospital, Inc.,* 958 F.2d 154 (6th Cir.1992). In this case, Natalie Johnston, a part-time nurse for defendant, was instructed on very short notice to work an unscheduled shift pursuant to the "mandatory overtime" provisions of the CBA. *Id.* at 155. Johnston worked the requested shift, but submitted a grievance asserting that she should have been paid time and a half for her efforts. *Id.*

Johnston relied upon the "call-back" and "on-call" provisions of the CBA to support her grievance. *Id.* at 155–56. The arbitrator determined that the additional hours that Johnston worked did not come within the scope of either the call-back or on-call provisions of the CBA. *Id.* at 156. However, finding that the hospital breached the CBA by "an abuse of the power to schedule," the arbitrator concluded that Johnston's circumstance was "analogous" to an on-call case. Accordingly, the arbitrator ruled that Johnston was to be paid time and a half for the work in question. The district court subsequently entered an order enforcing the arbitrator's award. *Id.*

In overturning the district court's decision, the Sixth Circuit noted that the CBA expressly granted to the hospital the sole and exclusive right to perform activities such as manage the hospital, supervise and control all operations therein, as well as direct all work activities of employees including scheduling the hours and days to be worked. *Id.* at 157. The court determined that the hospital simply could not be found to have "abused" a right specifically granted it in the CBA. Finding that the arbitrator's decision improperly "created a

contract term requiring sufficient notice of all schedule change[s]," the court denied enforcement of the arbitrator's decision. *Id.*

*Lourdes* is distinguishable from the present circumstance, however, in that Plaintiff's actions are not premised upon a right expressly granted to it by the Agreement. As the arbitrator correctly noted, the Agreement contains no provision permitting Plaintiff to "forever" discipline an employee in the manner in which Ouderkirk was disciplined. Furthermore, the "policies" on which Plaintiff relied in disciplining Ouderkirk do not support Plaintiff's actions. Even if such were the case, however, the Agreement contains no provision · permitting the employer to supplement the Agreement with non-bargained-for work "policies."

The other case on which Plaintiff relies, *Cleo Wrap v. United Paper Workers International Union*, 1993 WL 84523 (6th Cir., Mar.24, 1993), is similarly distinguishable. The CBA at issue in *Cleo Wrap* provided that the employer "shall" terminate "the employment of disabled employees...determined to be permanently incapable of performing their job requirements." *Id.* at *1. After determining that a particular employee, Lonnie Chalmers, was permanently disabled and, therefore, permanently incapable of performing the requirements of his job, Cleo Wrap fired him. *Id.* at *1–2. One week after Chalmers' termination, however, his doctor (who had previously reported that Chalmers suffered from a "permanent partial disability" which prevented him from performing his job duties) determined that Chalmers "could resume his regular duties, without restrictions, the following day." *Id.* at *1–2.

The arbitrator determined that Cleo Wrap's actions were warranted and that it acted "in good faith upon the best medical information then available." *Id.* at *2. The arbitrator nevertheless ordered Cleo Wrap to reinstate Chalmers. *Id.* at *2–3. The district court ordered that the arbitration award be enforced. *Id.* at *1.

The Sixth Circuit, however, overturned the district court's ruling. As the court noted, the parties stipulated that the only issue to be decided by the arbitrator was whether Chalmers was discharged in conformance with the CBA. *Id.* at *2. As the court indicated, the CBA provided that once the company determines that an employee is "permanently incapable of performing his job...the injured employee 'shall' be taken off the [seniority] list, his employment thereby being terminated." *Id.* at 3. As the court further noted, the CBA "does not say that a person whose employment has been properly terminated will be taken back if his disability subsequently turns out not to have been permanent after all." Finding that the arbitrator "nonetheless wrote such a provision into the contract," the court vacated the arbitrator's award. *Id.*

Again, Plaintiff has not in this instance acted pursuant to a particular provision of the Agreement, the provisions of which contradict or call into doubt the arbitrator's interpretation of the Agreement. Moreover, neither the arbitrator's interpretation of the Agreement nor his decision rely upon modification of language presently existing in the Agreement or the insertion of additional language into the Agreement. The Court concludes, therefore, that the arbitrator· has not imposed upon Plaintiff additional requirements not articulated in the Agreement.

III. *The Arbitrator did not Dispense his own Personal Notion of Industrial Justice*

In addition to his conclusion that the sanction imposed upon Ouderkirk vio-

lated the Agreement, as articulated above, the arbitrator also identified ten "good reasons personal to Mr. Ouderkirk, which support another chance in the Driver/Salesperson position." (Arbitrator's Ruling at 17–18). Such "reasons" are largely irrelevant and many are purely speculative. Plaintiff asserts that because the arbitrator improperly undertook to dispense his own notions of industrial justice, his award must be vacated.

As indicated above, an arbitration award based upon general considerations of fairness and equity, as opposed to the precise terms of the agreement, is unenforceable. If the present award were premised upon such considerations, Plaintiff's argument would be much more persuasive. The arbitrator's concluding comments that good reasons exist for giving Ouderkirk "another chance" as a driver/salesperson, however, constitute *dicta.*

First, the comments at issue are not directly related to the arbitrator's decision. The arbitrator ruled only that Plaintiff must permit Ouderkirk to bid on the next available driver/salesman position, not that Plaintiff has to reassign Ouderkirk to such position. That the arbitrator articulated reasons why, in his opinion, Plaintiff should reassign Ouderkirk to his previous position are only tangentially related to his decision. More significantly, the arbitrator's award is legally sufficient in the absence of the comments at issue. As detailed above, the arbitrator's award is based upon the precise terms of the Agreement.

As the Sixth Circuit has observed, an arbitration award can properly be found to rest upon notions of "fairness" and "equity" even though such words never appear in the arbitrator's ruling. *See Wyandot, Inc. v. Local 227, United Food and Commercial Workers Union,* 205 F.3d 922, 930 (6th Cir.2000). Alternatively, the arbitrator's mention of such notions does not necessarily result in the conclusion that such underlie his decision. As detailed above, the arbitrator's award is based upon the precise terms of the Agreement. The fact that he also chose to include the additional personal comments at issue is of no consequence.

## CONCLUSION

The Court empathizes with Plaintiff's position that it does not want to employ as a driver somebody who could potentially put at risk the lives of himself or others, as well as jeopardize Plaintiff's profitability or existence. Plaintiff's position in this respect seems very reasonable. Nonetheless, as Plaintiff has agreed to be bound by the Agreement, the Court is obligated to enforce it as it is written, not as Plaintiff wishes it were written.

As articulated herein, the Court concludes that the arbitrator's decision in this matter is consistent with the Agreement and complies with the relevant legal standards. Accordingly, the Court denies Plaintiff's motion for summary judgment and grants Defendant's motion for summary judgment.